**SIGNED.**

**Dated: December 07, 2009**



_____
**JAMES M. MARLAR**
**Chief Bankruptcy Judge**
_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HARLAN J. RATLIFF and THERESA  L. | ) No. 4:09-bk-03138-JMM |
| RATLIFF, | ) |
| | ) Adversary No. 4:09-ap-00275-JMM |
| Debtors. | ) |
| | ) |
| COCHISE AGRICULTURAL PROPERTIES, | ) |
| LLC; TODD CAMPBELL and STEPHANIE | ) |
| MCRAE, individually and as husband and wife, | ) |
| and derivatively on behalf of Cochise | ) |
| Agricultural Properties, LLC, | ) |
| | ) **MEMORANDUM DECISION** |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| RATLIFF FARMS, LLC, an Arizona limited | ) |
| liability company; HARLAN JEFFERSON | ) |
| RATLIFF and THERESA H. RATLIFF, | ) |
| husband and wife; and SECURITY TITLE | ) |
| AGENCY, INC., an Arizona business, | ) |
| | ) |
| Defendants. | ) |

A trial in this matter was held on September 28, 29, 30, October 1 and October 9, 2009.  At its conclusion, this court took the issues under advisement.  It has now studied each of the admitted exhibits, considered the pertinent testimony of the witnesses, and has reviewed the applicable law.

The discussion which follows will constitute the court's written findings of fact and conclusions of law.  FED. R. BANKR. P. 7052 (FED. R. CIV. P.  52).  As part of the foregoing, the court will answer the questions on the issues as set forth in the parties' Joint Pretrial Statement.

Once a judgment is entered, any party aggrieved thereby will have fourteen days after its docketing within which to file a notice of appeal. FED. R. BANKR. P. 8002 (amended and effective December 1, 2009).

## JURISDICTION

This court has core jurisdiction over the issues in this case, as they involve entitlement issues as to the proceeds of an instalment sales contract, and associated issues of non-dischargeability. 28 U.S.C. §§ 157(b)(2)(A), (C), (I), (K) and (O).

## PROCEDURE

The Debtors filed a voluntary Chapter 13 case on February 24, 2009, and upon their own motion, the case was converted to a Chapter 11 on April 20, 2009. As yet undetermined, at that time, were claims being asserted against Defendants Ratliff and Ratliff Farms, and counterclaims which those parties asserted against the Plaintiffs. Those claims were pending in Maricopa County Superior Court (Case No. CV2007-018719) (the "Superior Court Case") at the time of the bankruptcy filing, when the Superior Court Case was removed to this court for resolution.

Once the Superior Court Case became part of the Debtors' bankruptcy estate, new issues concerning the non-dischargeability of certain unliquidated debts became ripe for decision in the bankruptcy court. Until bankruptcy was filed, non-dischargeability was not an issue. *Brown v. Felsen*, 442 U.S. 127, 138-39, 99 S.Ct. 2205, 2212-13 (1979).

After this matter is decided, the Debtors will then have some certainty with respect to a major portion of their estate, and will be in a position to propose a plan of reorganization, or otherwise react to the legal options available to them.

During the course of the trial, Plaintiffs dismissed certain fraud-related claims against the Defendants.

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 2 of 40

One other procedural matter requires decision. At the conclusion of Plaintiffs' case, the Defendants Ratliff and Ratliff Farms moved for involuntary dismissal (directed verdict) pursuant to FED. R. CIV. P. 41; FED. R. CIV. P. 52(c) (applicable to bankruptcy proceedings by FED. R. BANKR. P. 7052). The court took the matter under advisement. After considering the record, that motion is DENIED.

## FACTS

### A.  The Parties

The Plaintiffs are Todd Campbell and Stephanie McRae, husband and wife (the "Campbells"). Joining them is a limited liability company, Cochise Agricultural Properties, LLC ("CAP"). The Campbells are 50% members of CAP.

The Defendants are Harlan "Jeff" Ratliff and Theresa Ratliff, husband and wife (the "Ratliffs"). A collateral defendant is Ratliff Farms, LLC ("RF"). RF is owned 100% by the Ratliffs. The Ratliffs are also 50% members of CAP.

While Security Title Agency, Inc. is named as a defendant, it is merely a stakeholder, and no independent judgment is sought against it, other than to provide it direction as to future disbursements. Hereafter, "Defendants" shall include only the Ratliffs and RF.

The Campbells and Ratliffs are equal members/owners of CAP.

Also notable is that each wife-party is, and was at all relevant times, a licensed Arizona attorney.

### B.  Concise Overview of the Dispute

A dispute developed between the Campbells and the Ratliffs as to their respective rights relative to CAP. In February, 2005, the parties formed CAP. Since then, the CAP assets have

been sold, on an instalment basis, to a third party, which has made and continues to make annual payments.

The parties have asked this court to declare their respective rights, and to adjust their capital account balances in accordance with their established ownership interests.

Other contractual, equitable and tort remedies related to the monetary dispute also have arisen as alternative theories. And, since the Ratliffs have now filed a Chapter 11 proceeding in the bankruptcy court, non-dischargeability issues have also become pertinent.

## C.  The Ratliffs' Farming Operations

The Ratliffs are farmers. Jeff Ratliff operates that aspect of the community effort, while Theresa Ratliff serves as a full-time family law commissioner and judge pro tem in the Pinal County Superior Court.

For years, the Ratliffs have farmed in Cochise County, Arizona. On February 25, 2000, they formed Ratliff Farms, LLC ("RF"). Jeff Ratliff and Theresa Ratliff each held a 50% interest in that entity (P-1).

## D.  The Ratliffs Acquire 1,105-Acre Farm

In February, 2004, the Ratliffs had an opportunity to purchase a dormant two-parcel farm in Cochise County, Arizona from the Wiegands. That land had not been farmed for 20-30 years. (Jeff Ratliff testimony.) The purchase price was $427,539 (D-300; P-40, P-60). In order to partially pay for this purchase, the Ratliffs borrowed money from Western Bank of Lordsburg, New Mexico. The bank made two loans in connection with the purchase transaction, both notes bearing the date of February 5, 2004:

4

1                Note No. 1 for   $299,492.50

2                Note No. 2 for   <u>$90,155.00</u>

3                               $389,647.50

(P-40, P-60.)  Both notes were for a one-year period only, which matured and became due on February 5, 2005, and both notes were secured by deeds of trust on the farm (D-300).

The escrow closed, and the deeds to the Ratliffs were recorded on February 12, 2004 (D-301, D-302).  The Ratliffs accepted the deeds as community property  (D- 301, D-302).

Some months later, in approximately June, 2004, an entity known as Bohlender South Farms indicated an interest in buying the farm for $956,000 (D-303).  However, no contract was ever signed by the parties, nor was an escrow opened.  Todd Campbell was never told about this possible offer.

## E.  A Common Enterprise Begins

On July 21, 2004, both Jeff Ratliff and Todd Campbell each signed and dated a one-page handwritten document, which, in its totality, stated:

> I hereby transfer 50% interest in the Farm Real Estate located 1/2 mile east of Bell Ranch Road, in Sunizona Arizona to Todd Campbell and Family for $10.00 and other considerations.[1]

The impetus for the July 21, 2004 "transfer" between Jeff Ratliff and Todd Campbell had a percolating history.  The two men had known each other from college days, and at various times had discussed the possibility of going into a business venture together.

At about the time same, from Jeff Ratliff's perspective, several concerns were occurring simultaneously.  First, there was the looming maturity of the two Western Bank loans

---

[1]      Although Stephanie McRae testified that the document was written in the fall (approximately October) of 2004, and Jeff Ratliff testified it was prepared in May, 2005, the court finds that the July 21, 2004 date, which appears three times on the document in the handwriting of both Jeff Ratliff and Todd Campbell, is the most credible evidence of when it was signed.  The parties are estopped from presenting conflicting parol testimony which challenges the handwritten date.

against the 1,105-acre farm, coming due on February 5, 2005; second, Jeff Ratliff saw that land values in the area might be appreciating, due to the Bohlender interest, which could not be realized unless he could extend the Western Bank obligations and not lose the farm to foreclosure; third, Jeff Ratliff felt that the farm could be improved for cultivation, because it had been dormant for decades, further enhancing its value; and fourth, Todd Campbell had the good credit available which would allow the property to be improved for farming or for resale, and which would protect the investment from foreclosure. Jeff Ratliff believed that the Campbells' financial strength was needed in order to retain and improve, and eventually sell, the farm. (*See* P-12; D-312.)

On September 13, 2004, Jeff Ratliff signed a one-year listing agreement with Willcox Real Estate, in an effort to sell the farm (D-305).

As for improving the property in the meantime, the Campbells lent their credit to that effort (P-4). Jeff Ratliff, pursuing that new equipment (pivots) angle with First National Omaha, received its commitment to fund $519,445.67 for the purchase and installation of a pivot irrigation system.

By October 7, 2004, the pivot financing was moving forward, and Jeff Ratliff was urging Todd Campbell to "put together the partnership agreement" as "We're in business!" (P-5.)

On October 26, 2004, Western Bank wrote to Jeff Ratliff, reminding him that the two loans with one-year maturities were fully due on February 5, 2005. The bank insisted on full payment, as that had been "the assurance from you in February 2004" (P- 6). The bank rejected Jeff Ratliff's request to refinance the loans for 15-20 years, as well as his request that all accrued interest be recapitalized (P-6).

But by December 21, 2004, Western Bank had agreed to extend, for an additional year (until February 5, 2006), the two loans secured by the farm (D-308; P-7).

### F. The Venture is Formalized as "Cochise Agricultural Properties, LLC" ("CAP")

By February, 2005, the loose ends on the formation of the business enterprise, and the outstanding problems in extending the land loan and obtaining new financing of the pivot irrigation

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 6 of 40

system were coming together (P-12; D-312). The Western Bank land loans were to be extended for one year, and a $519,445.67 loan for a pivot irrigation system was committed by First National Omaha (P-12, 29).

Effective as of February 24, 2005, the Ratliffs and the Campbells signed the Operating Agreement of CAP (D-311). The Articles of Incorporation were filed with the Arizona Corporation Commission on the same day (P-13). Each couple had a 50% interest in CAP, and they noted that each had contributed 50% to the capital of the enterprise (D-311).[2]

## G. Farm Improvements, Appreciating Real Estate Values and the Benross Offer

By late March, 2005, Jeff Ratliff informed Todd Campbell that real estate in Cochise County was creating much interest among investment companies, which were "paying the top dollar for larger parcels like ours," perhaps as high as $3,300 per acre (D-316).

In April 2005, to acquire the components for the center pivot irrigation system, CAP executed six purchase money instalment notes and security agreements with First National Equipment Finance, Inc. ("FNEF"). The details were:

| Loan No. | Principal | Due | Annual Payment |
|----------|-----------|-----|----------------|
| 0013602-000 | $108,002.45 | 04/15/2012 | $19,883.35 |
| 0013607-000 | $68,573.87 | 04/15/2012 | $12,630.89 |
| 0013606-000 | $68,573.87 | 04/15/2012 | $12,630.89 |
| 0013609-000 | $68,573.87 | 04/15/2012 | $12,630.89 |
| 0013605-000 | $68,573.87 | 04/15/2012 | $12,630.89 |
| 0013608-000 | $68,573.87 | 04/15/2012 | $12,630.89 |
| Total | $450,871.80 | | |

The total principal amount borrowed was $450,871.80 (D-319).

---

[2] It is immaterial that that interest may have changed, for Farm Credit Systems' banking regulatory purposes to 50.01% (Ratliffs) and 49.99% (Campbells) (P-17, P-19; D- 315, D-317). The Operating Agreement of CAP was never changed.

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 7 of 40

These notes were personally guaranteed by:

Todd W. Campbell

Stephanie A. McRae

Harlan J. Ratliff aka Jeff Ratliff

Theresa L. Ratliff

Ratliff Farms, LLC

Around April 12, 2005, an entity known as the Benross Corporation began negotiations with CAP for the purchase of the farm (D-323, D-324; P-20). The price offered was $3,300 per acre, assuming 1,120 acres (P-20).

At that same time, however, the extension of the Western Bank land loans had still not been finalized. When Western Bank was informed of the possible sale of the property, it felt matters could move more quickly by simply paying off the balance at closing (P-21). A one-year extension, to June 1, 2006, was then executed on May 18, 2005 (D-330). CAP was the borrower under the Western Bank documents (D-330).

As for the Benross offer, Jeff Ratliff marked up the offer, countered with several corrections, including a notation that there were only 1,105 acres (thus lowering the price to $3,646,500) (P-20). The document was then signed by the Campbells, the Ratliffs and CAP. In addition, an attachment "A" was appended which noted that the title had been transferred, but not recorded, to both the Ratliffs and the Campbells in July, 2004, and that each couple constituted the complete membership of CAP (P-20). This document was then transmitted to the Benross agents (P-22, P-23, P-24).[3]

Escrow instructions for the Benross sale were sent by Jeff Ratliff on May 25, 2005 to open escrow for 1,105 acres at $3,300 per acres, for a total of $3,646,500 (D-329). However, escrow never opened and the Benross contract was never consummated.

Similarly, the Kizer-Harris back-up offer stalled, and it too died.

---

[3]     At the same time, Jeff Ratliff, for CAP, was also negotiating a back-up offer with Aaron Kizer and Ben Harris for $2,762,500 (P-21, P-25). He also attached the same attachment "A" to it as he had to the Benross offer (P-25, P-27).

## H. Extending the Land Loan

In June 2005, CAP and its members completed the process of extending the land loan to Western Bank.

As for Western Bank, an escrow was opened with Pioneer Title (P-30; D-331), into which the Campbells deposited a check dated June 9, 2005 for $50,562.96 (P-31). This check was to bring the interest current. At the same time, because CAP was to become a new, or co-borrower to Western, and also to complete their business agreements relating to CAP, CAP's acquisition of title to the former Ratliff-titled property was finalized. That title transferred upon closing, and was recorded June 20, 2005 (P-32; D-332). Western Bank's primary land loan was "paid off" by renewal for an additional year. The principal payoff amount was $389,647.50[4] (D-331).

## I. Ratliff Farms' Agreement to Farm the CAP Land

After the Western Bank refinancing uncertainties were alleviated, and with the pressure of the delinquent Western Bank loan behind it, CAP and the Ratliffs began to implement their next strategies. In that regard, CAP agreed to allow RF to farm the land, and in so doing, agreed to allow RF and the Ratliffs, individually, to use CAP's 1,105-acre farm as collateral for the debts of RF and the Ratliffs related to the expenses of the farming operations.

On that agreement, then, the Ratliffs and RF were able to secure a $350,000 operating line of credit from Wells Fargo. That loan closed on July 15, 2005. Wells Fargo secured the RF and Ratliffs' debt with an Agricultural Security Agreement, as well as a junior deed of trust on the CAP farm, behind Western Bank (D-334, D-389). CAP agreed to encumber its land for this purpose, but it was not a signator to the borrowing.

Thus, by mid-2005, CAP had obligated itself to a $389,547.50 one-year extension of the land loan to Western Bank, the six loans for the new pivot irrigation system to FNEF for

---

[4] The Pioneer settlement statement reflects that CAP paid in $70,368.82, of which at least $50,562.96 came from the Campbells (D-331).

$450,871.80 and had pledged its real property to Wells Fargo to secure the Ratliffs' and RF's personal, farming-related obligations.

The understanding of CAP and its members was that the actual farming of the CAP land, along with its benefits, risks, profits and losses were to be those of the Ratliffs and RF only. No agreement was ever negotiated that would have placed CAP into any type of partnership with the Ratliffs or RF in conjunction with their separate farming operation.

The intent of the CAP members was to improve the land, hope for an eventual sale, and to let the Ratliffs and RF actively farm it, for their sole benefit, in the interim.

With regard to the efforts to sell, Willcox Real Estate continued that effort, advertising the farm for sale for $3,532,000 (P-33, June 27, 2005).

## J.  The Maricopa Orchards / N.K. of Casa Grande Offer

In late June or July, 2005, Willcox Real Estate's efforts bore fruit.  An entity known as Maricopa Orchards, LLC (or nominee) entered into a purchase contract, offering $3,520,000[5] for the land (P-35; D-337).  That offer contained an additional requirement that the "sale is subject to lease agreement with Jeff Ratliff for a three-year term with an additional two years option" (P-35; D-335).

The sale contract called for a $1,100,000 down payment, with a $2,420,000 seller-financed "carryback" note and deed of trust (P-35).  Five annual instalment payments of principal and interest were to be made to reduce the carryback note (D-335).

CAP was the seller, as it owned the land.  In mid-September, N.K. of Casa Grande was substituted for Maricopa Orchards as the buyer (D-337).

Closing was set for October 7, 2005 (D-337).

---

[5]     The contract is illegible.  This figure could be $3,528,000.

10

In preparation for the close of escrow, CAP granted Jeff Ratliff the power to execute the necessary documents on its behalf (P-36; D-340). Nothing in that corporate resolution authorized the payoff of any Ratliff or RF personal loans or debts.

In order to document the separate aspect of the sale contract, which was the lease of the farm to Jeff Ratliff personally, N.K. and RF entered into a lease agreement (P-34; D-338). That document was dated September 30, 2005. According to Jeff Ratliff, he needed to plant his crops by October 3-7, 2005, so that he would not endanger the crops by a late planting, and expose it to possible frost damage. (*See* Sec. 23 of P-34 and D-338.) CAP was not a party to this lease agreement.

By October 4, 2005, the escrow was set to close. The buyer, N.K., was to place over $1,000,000 in escrow. From that down payment, the CAP equipment financing loans to FNEF were to be paid off, as were the secured obligations due Western Bank (D-339).

But there was a hiccup. At the last minute, the recorded deed of trust to Wells Fargo, securing the $350,000 line of credit to RF and the Ratliffs, recorded July 29, 2005, was discovered. There was, therefore, not enough cash, at escrow closing, to pay it and the other encumbrances. That issue was resolved by Wells Fargo's agreement to release its deed of trust, in return for substitute collateral in the form of an assignment of the carryback note and deed of trust (D-341; P-38). This was acceptable to CAP (D-344; P-38, P-37). With that issue then resolved, along with another small issue involving easement rights (D-342), the sale to N.K. was closed on or about October 24, 2005 (P-38). The Wells Fargo documents were finalized between November 7 and December 2, 2005, post-closing (P-38).

N.K.'s carryback note, in favor of CAP, was in the principal amount of $2,398,771.20 (P-38; D-345).

**K. The Ratliffs Begin to Sense Looming Difficulties and Look for a Way Out**

For the Ratliffs and RF, the closing of the N.K. sale still left them with problems. Because of their lease agreement with N.K. (P-34), and the delays in closing escrow, they missed

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 11 of 40

their planting window of October 3-7. In preparation therefor, however, they had incurred expenses in readying the ground for the season. A timely planting would have better assured repayment of their obligations to Wells Fargo on the $350,000 borrowing. But with no alfalfa crops in the ground, the Ratliffs and RF had no promise of future income that crop year, and therefore no source of repayment for the Wells Fargo debt..

By mid-November, 2005, Jeff Ratliff began sharing his concerns with Todd Campbell, and suggesting that CAP participate in the farming business with the Ratliffs (P-41).

The Campbells did not intend to do so. Their obligations (and CAP's) were now limited to collecting each year's annual payment from N.K., and trusting that the Ratliffs, through farming the property through their separate lease agreement, and making a profit thereon, could pay off their separate $350,000 Wells Fargo debt, which still encumbered the N.K. receivable--a CAP asset.

On this unsteady basis, events moved into 2006.

## L. The Dispute Boils Over

As 2006 began, Jeff Ratliff continued to pressure the Campbells to join him in farming the lease with N.K. His motivation was to obtain some relief on his and RF's debt obligations. But he also felt that, since he could not plant due to the late escrow, that N.K. might contend that RF and Ratliff had breached their lease, and that might spill over into an offset claim against future years' instalment payments due to CAP (P-46; D-347, D-348; *see, also,* June 6, 2006 email, D-354.)

By January 25, 2006, Jeff Ratliff was getting more desperate, and began attempting to shift all farming preparation expenses of RF to CAP (P-47). As Jeff Ratliff noted at trial: "I needed help. I didn't want to be in the red." But the Campbells did not take the bait, and held steadfast to the understandings and writings that kept them, and CAP, out of the farming operation. Jeff Ratliff's communications seeking a Campbell/CAP commitment to farming went unanswered, and in a February 8, 2006 email, Jeff Ratliff acknowledged: "There aren't any documents between Ratliff Farms and CAP" regarding their joint involvement in any future farming operations (P-48).

1    Throughout 2006, various interest payments from N.K. were divided between the

2    parties.

3         By mid-summer, 2006, the issue of whether CAP had any liability to RF, and in what

4    amount for farming preparation expenses, simmered and then got worse as the year progressed.

5    With N.K.'s first annual payment in October, 2006, the dispute boiled over.

6

7                          **M.  The Dispute is Clarified**

8

9         The first annual instalment payment from N.K. came due, and was made in October,

10   2006.  At that time, the Rafliffs' and RF's  $350,000 line of credit to Wells Fargo had become due.

11   This was the operating line of credit which the Ratliffs and RF had borrowed in order to prepare the

12   land in anticipation of the lease with N.K.  CAP had pledged the land as collateral for the debt,

13   although CAP had no responsibility for its repayment.

14        With N.K.'s first instalment of around $479,754.20, Wells Fargo demanded from the

15   proceeds, and received, its payoff in the sum of $358,902.89 (P-56, P-57, P-76; D-364).  The Ratliffs

16   had used this line of credit, in that amount, to pay personal living expenses, as well as other personal

17   or RF obligations (P-41).

18        Jeff Ratliff agreed that this debt was solely his, his wife's and RF's obligation (subject

19   to certain offsets) and that "there is now a note receivable from ratliff farms to cochise ag properties

20   for the amount of the [Wells Fargo loan].  Ratliff farms llc will now prepare a statement for services

21   rendered and present it for credit against the note" (sic) (P-56).

22        In an email dated October 28, 2006, Jeff Ratliff acknowledged Ratliffs'/RF's liability

23   to CAP, but claimed that, since the escrow with N.K. could not have closed without the Ratliff/RF

24   lease, he felt that, "as we agreed upon, Ratliff Farms llc will repay [to CAP] the difference between

25   the services rendered and the value of the note [to Wells Fargo]" (sic) (P-56).

26        The Campbells were upset because a large portion of their share of the N.K. instalment

27   had been used to pay off the Wells Fargo obligation, although they understood that Wells Fargo had

28   that right under the documents which CAP had signed.  They felt that the Ratliffs should have made

13

other arrangements with Wells Fargo, without jeopardizing the Campbells' share (P-56) of the N.K. annual instalment.

But Todd Campbell acknowledged a CAP obligation for Ratliffs'/RF's preparation of the land, pre-closing, when he observed: "Then when you get us the receipts for the hard costs for the farm prep. we need to review them before we [CAP] reimburse you . . . ." (P-56).

On November 10, 2006, RF sent Todd Campbell a breakdown of claimed expenses totaling $284,817.59:

| | |
|---|---|
| • Direct expenses (tillage, labor, seed, electrical, tractor, misc.) | $ 68,859.29 |
| • Commission (10% of net profit to CAP) | 215,958.30 |
| **Total** | $284,817.59 |

(D-356; P-59.)

There had never been any conversation or written agreement regarding the payment, by CAP, of a "commission" to the Ratliffs or RF. In fact, Willcox Real Estate had been paid a broker's commission of $212,218 at closing. Jeff Ratliff also testified that he would not have requested this "commission" if his expectations for farming the N.K. lease had materialized.

In early November, the balance remaining from the N.K. first instalment was split equally between the CAP couples, in the sum of $39,133.33 each. The amount of $2,000 was left in the bank account for future expenses (P-58).[6]

_____

[6]     A rough accounting of the first N.K. instalment is:

| | | |
|---|---|---|
| N.K. payment | $437,168.94 | (P-76; D-364) |
| (Less: Wells Fargo payoff) | (358,902.89) | (P-76) |
| | $78,266.05 | |
| (Less: To Campbells) | $39,133.33 | (P-76) |
| (Less: To Ratliffs) | 39,133.33 | (P-76) |
| | -0- | |

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 14 of 40

After receipt of their check, again, Todd Campbell requested "to see the receipts for the farm prep costs before we can agree to reimbursement." (P-58.)

As 2006 drew to a close, the accounting controversy between CAP and the Ratliffs was still lingering.

As for the Ratliffs, they had been sued in Superior Court by N.K. for breach of the lease (para. 25, D-360), for failure to pay the periodic lease payments. At the same time, they entered into a new lease with N.K. which they hoped could mitigate any losses.

But Jeff Ratliff's earlier worries about CAP being sued for his separate breach of the first N.K. lease agreement had not materialized, as N.K. made no offset claims against CAP.

Thus ended 2006.

## N.  The Litigation

In 2007, N.K. made quarterly interest payments in the following amounts:

| | |
|---|---|
| January 9 | $28,798.01 |
| April 16 | $28,798.01 |
| July 24 | $28,798.01 |
| October 15 | $28,798.01 |

After expenses and fees, these payments were divided equally between the Ratliffs and the Campbells (P-76, P-77, P-78; D-364).

As for the disagreements over the payoff to Wells Fargo, those continued into 2007 (P-66, P-67, P-68). In an email dated January 17, 2007, Todd Campbell again acknowledged that: "We have said that we would consider CAP's reimbursement of your hard costs for farm prep if you were not able to farm the land and if you provided us with sufficient supporting documentation." (P-66.)  Besides again expressing dismay over Jeff Ratliff's charging a "commission," Todd Campbell also complained about the sufficiency of the $51,131.04 charge levied by Jeff Ratliff's

1  brother which was just "scribbled notes," and "was not at all clear about what work was performed
2  and when." (*See* D-356.)

3        Matters continued to deteriorate until, on the eve of the second N.K. annual instalment,
4  the Campbells filed an action against the Ratliffs and RF in Maricopa County Superior Court, Case
5  No. CV2007-018719 (the "Superior Court Case"). The complaint contained 11 counts and sought
6  injunctive relief as to the upcoming N.K. payment. Filed about October 12, 2007, the Campbells
7  obtained a temporary restraining order. Before the preliminary injunction hearing, the parties
8  stabilized an agreement as to the N.K. payment (P-74), and were proceeding to litigate the
9  complaint and counterclaim when the Ratliffs filed a Chapter 13 case on February 24, 2009, which
10 was quickly converted to a Chapter 11 on April 20, 2009.

11       The Superior Court Case was removed to bankruptcy court, and combined with a non-
12 dischargeability contention.

13       All matters were tried over a period of five days.

15                    **O. Capital Contributions: The Essence of the Dispute**

17       At the heart of this dispute, and from which the subsequent accounting issues spring,
18 is a determination of the capital contribution of each couple (Ratliffs and Campbells) to the limited
19 liability corporation, CAP.

20       Once that question is decided, then questions remain about how much is owed to each
21 couple, from past transactions, and how are future N.K. payments of principal and interest to be
22 divided.

24                    **1. The Respective Interests of Each Couple**

26       From the outset of the venture, the agreement of the two couples (Ratliffs and
27 Campbells) was to form an equal "partnership," in the legal form of a limited liability corporation.
28 All documents are consistent with this intention, from the handwritten July 21, 2004 one-page

Case 4:09-ap-00275-JMM   Doc 77   Filed 12/07/09   Entered 12/08/09 09:23:36   Desc
Main Document      Page 16 of 40

writing, evidencing transfer of a half-interest in the farm, to the tax returns, to distributions, to the Operating Agreement and various communications.[7]

Although at one point, for lending purposes, some documents created a 50.01% interest for the Ratliffs , and a 49.99% interest for the Campbells, that was an artificial creation for a limited business purpose. In any event, the difference is so small as to be essentially meaningless in any material respect.

The CAP Operating Agreement provided for a 50% interest in each couple, and that agreement was never amended (D-311, p. 29; *see, also*, Sec. 10.6: ". . . amended only by written consent . . . .").

Thus, the court finds and concludes that, from its inception, the parties intended to create equal ownership in the business venture which became known as CAP.

## 2. The Capital Accounts

Where the parties now mainly disagree is what is the respective amount of their capital accounts in the CAP business endeavor, and how should profits be shared.

The February 24, 2005 Operating Agreement defines "capital contribution" as "the total amount of cash and the fair market value of any other Property contributed" by each member or "interest holder." (Para. 2.1.5, D-311.)

The Campbells contributed an initial $500 for their 50% membership interest, and later on June 9, 2005, contributed an additional $50,562 to pay accrued interest on the Western Bank secured obligation in order to obtain a one-year extension of that secured land loan (D-311 at 29).

The Ratliffs also contributed $500 initially (D-311 at 29), and also contributed the equity in the farm owned by them. That equality agreement had occurred in concept, if not legally, on July 21, 2004, when each husband (Jeff Ratliff and Todd Campbell) signed a handwritten document to that effect. It made no mention of values. That transfer became legally effective on

---

[7] As an example, even after the relationship began to fray, Jeff Ratliff wrote to Todd Campbell on November 6, 2006, and stated: "We are equal partners." (P-58.)

June 20, 2005 (P-32; D-332) when the Ratliffs legally transferred the farm to the CAP entity, of which they were half owners. That was their capital contribution, and their equity in the 1,105-acre farm was approximately equivalent to the Campbells' cash contribution.

The dispute concerning the Ratliffs' contribution of the farm land is focused on its value at the time of the contribution. Neither party produced an appraisal of the farm as of any relevant date--July 21, 2004, February 24, 2005 or June 20, 2005.

For purposes of this discussion, the court finds, as a matter of law, that there was no legal transfer of the farm by virtue of the handwritten note of July 21, 2004. This is for several reasons:

    a.    The farm was then owned by the marital community of Harlan and Theresa Ratliff, and conveyances of real property may only be accomplished by the signatures of both spouses. As Theresa Ratliff did not sign the handwritten note of July 21, 2004, there was no conveyance. ARIZ. REV. STAT. § 25- 214(C)(1).

    b.    The document bore no legal description. *See, e.g.,* ARIZ. REV. STAT. § 44-101 (statute of frauds); ARIZ. REV. STAT. § 33-401(A); *see also Carley v. Lee*, 58 Ariz. 268, 272, 119 P.2d 236 , 238 (1941) (contract for sale of realty must be "definite and specific in its terms"); *T.D. Dennis Builder, Inc. v. Goff*, 101 Ariz. 211, 213, 418 P.2d 367, 369 (1966) (writing for sale of realty "must contain: an identification of the parties, a description of the subject matter of the contract, the purchase price and the time and conditions of payment").

    c.    The document was not acknowledged or notarized. ARIZ. REV. STAT. § 33-401(B).

But these facts are not dispositive. It was always the parties' intent, from July 21, 2004 to combine their assets and talents into a common, shared enterprise, and to become "equal partners." (Emphasis supplied.) (*See, e.g.,* P-58, written over two years later.) The handwritten document convincingly supports that intention.

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 18 of 40

Returning to the value of the farm as of the relevant dates, the parties now hold two radically different views:

- The Ratliffs wish to use the "net value" of the farm, calculated by the N.K. sale on October 24, 2005. This value, they maintain, is $2,372,943.95 (D-379).

- The Campbells seek to use the "book value" of the farm as of the contribution date(s), which is what the Ratliffs purchased the farm for, less debt against it, and using only the equity as the contribution. This value is $37,842 (P-60).

The Ratliff documents relied upon, created by their CPA on June 27, 2008, were created after this litigation had commenced, and were ones with which the Ratliff accountant was clearly uncomfortable (P-81; D-379). CPA Martha Quiros was not confident that her revisions would stand scrutiny as she noted that the recalculation was "based on a different set of circumstances than was originally presented to us. . . ." (P-81; D-379.) In addition, Ms. Quiros observed: "We have not determined which set of circumstances is correct--it appears that a court may end up making that determination." (P-81; D-379.) Ms. Quiros was never advised to amend any prior year's tax return.

More credible are earlier memoranda, made at a time when the parties' dispute had not reached the breaking point, and when the parties were compatible. In particular are the notes made by the Ratliffs' accountant, Ms. Quiros, on November 16, 2006, confirmed by Jeff Ratliff on the same day: "That's how it took place, good notes!" (P-40, P-60.)

In that memo, Ms. Quiros found that the fair market value of the farm was what the Ratliffs paid for it in February, 2004, $427,539. She calculated the Ratliffs' equity as $37,892, after deducting the purchase money debt of $389,647. (Ex. P-40, P-60.) In general, though, the notes of Ms. Quiros do not square fully with the facts of this case. For example, in attempting to square the capital accounts, Ms. Quiros concluded that a sale of a half-interest in the farm occurred in October, 2004. No credible evidence supports a transfer on that date. But that date is used in several tax returns. (*See, e.g.,* P-9, P-51; D-384, D-386.)

19

However, what is important to note from Ms. Quiros' summary is a confirmation that the Ratliffs, in mid-2004, sensed an inability to pay the Western Bank loan on its coming due date in February, 2005, and they needed "the strength of Todd's [Campbell's] credit" so that Western Bank would not "foreclose on the property when payment was not made as due in February of 2005" (P-40, P-60), and that they were willing to contribute their equity in the farm in return for the Campbells' financial strength.

The court finds that, when the property was actually transferred to CAP on June 20, 2005, the Ratliffs' contribution was the amount of their equity, $37,892 (P-60). When they transferred 1,105 acres, which had a fair market value of $427,539, that property was encumbered by a debt of $389,647 (P-40, P-60). The equity ($37,892) was their true contribution to CAP.

### 3.  The Tax Returns

**Harlan and Theresa Ratliff - 2004**

In filing their 2004 individual income tax returns, on or about February 28, 2005, the Ratliffs made no mention of any "sale" of a portion of the farmland to either the Campbells or CAP (D-370).

But a year later, on or about March 7, 2006, the Ratliffs filed an amended tax return for 2004, in which they reported a sale of a half-interest in the farmland. They reflected that transfer to have occurred on October 1, 2004, and the value of the transfer to be $213,770.[8] This was, by the CPA's acknowledgment, "sold at no gain or loss." Doubling that figure squares with Ms. Quiros' conclusion on November 16, 2006, confirmed by Jeff Ratliff, that the net book value of the full farm on October 1, 2004 was $427,539. ($213,770 is half of $427,539.) (P-40, P-60, P-8, P-52; D-383.)

---

[8]    This figure, multiplied by two, equals $427,540. That figure is $1.00 more than their 2004 purchase price.

**Ratliff Farms, LLC - 2004**

In its 2004 amended returns, filed an or about March 4, 2006, RF noted that a farm (the CAP farm) was purchased in February, 2004, and it, along with its debt, was transferred to its members (Jeff and Theresa Ratliff) on October 1, 2004 (D-386; P-9).

**Cochise Agricultural Properties - 2005**

CAP was formed on February 24, 2005.  On March 6, 2006, it filed its tax return, applying the partnership rules (P-51; D-384).  These returns reflected the ownership in the enterprise to be 50.01% (Ratliffs) and 49.99% (Campbells).  As noted above, this minor difference in interests was artificial and inconsistent with the 50/50 provisions evidenced by CAP's Operating Agreement.

Importantly, it established their respective ending capital accounts, at the end of 2005, to be almost equal:

| | |
|---|---|
| Harlan and Theresa Ratliff | $397,175 |
| Todd Campbell and Stephanie McRae | $ 397,024 |

(P-51; D-384).  And, the 2005 tax return noted the sale of the CAP farm, and the carryback note from N.K. of $2,398,771.  The return also reported that CAP had acquired the farm on October 1, 2004 (Sched. 6252, D-384 and P-51).  This information also is reflective of the parties' intention to have created equal interests as early as July 21, 2004.

**Ratliff Farms, LLC - 2006**

In its 2006 amended tax return, filed on or about August 8, 2008, RF noted its dispute with CAP over a $68,859 expenditure charged to CAP.  The tax returns stated that since the obligations had not been consented to by two of CAP's "partners,"that this amount should be treated as "a draw on the books" of CAP (P-64, P-65).

**Cochise Agricultural Properties - 2006**

In its 2006 partnership return, filed on or about May 3, 2007, the company valued each couple-members' ending capital accounts as:

| | | |
|---|---|---|
| Ratliffs | $454,009 | (50.01%) |
| Campbells | $453,795 | (49.99%) |

(P-62.)  Again, these sums do not support the claim now made by the Ratliffs as to the grossly superior value of their capital contribution.

### 4.  The Experts

Each side retained experts for the purpose of assisting the court in determining how to balance the disputed CAP capital accounts.

The Ratliffs retained Christopher G. Linscott, a Tucson CPA and respected member of the Tucson business community.  He prepared a report which was admitted into evidence.  Mr. Linscott's principal point was that he felt the Ratliffs should be credited $2,551,117 as their initial capital contribution (D-365).   This figure was based on the October 24, 2005 sale to N.K., and represented the net value of the land after deduction for the underlying Western Bank lien and the equipment financing.  The difficulties with this scenario are many.

First, Mr. Linscott has no credentials as an appraiser.  Without any market support, he simply assumes that the land's value between July 21, 2004 (the handwritten note, P-3) and June 20, 2005 (the deed from the Ratliffs to CAP, P-32; D-332), was equal to the later sale price on October 23, 2005.  This analysis is flawed because, among other things, the land, in July, 2004, or February or July 2005, had not been farmed in 20-30 years, and had not yet been improved by the pivot irrigation system.  This had changed by October, 2005.

Second, Mr. Linscott gave no value or weight to the Campbells' contributions to that land in the form of cash or financial strength.  Without their stable and timely credit worthiness,

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 22 of 40

1  Western Bank would not have extended the loan for an additional year, and would have probably

2  foreclosed.  Nor would FNEF have lent money for the purchase of the pivot irrigation system in the

3  spring of 2005, a factor in the sale to N.K.

4         Third, to the extent he relied on general land appreciation in Cochise County to

5  interpolate a retroactive value in the farm, Mr. Linscott lacks the credentials to opine on the

6  property's value, or to use that speculative and unorthodox method to arrive at a capital contribution

7  of encumbered land to an LLC.  Even appraisers use current comparables, and do not interpolate,

8  nor does that method have a scintilla of reliable precision.  Mr. Linscott's novel approach is not an

9  accepted valuation method.  Nor did Mr. Linscott utilize an alternate approach as an appraiser might

10  do, nor even rely on any appraisal done by anyone else with proper appraisal credentials.

11         Fourth, it appears from reading the totality of Mr. Linscott's report, that he strayed

12  well beyond his area of expertise to render legal opinions which are the province of a court.  Mr.

13  Linscott's credentials do not include that of an attorney-at-law.  In addition, he opined on factual

14  matters beyond his realm of expertise.

15         Fifth, the only credible evidence of the farm's value, on February 24, 2005, was its

16  actual sales price of the year before.  A sale at a commercially reasonable value is the best indication

17  of a property's value.  *In re Two "S" Corp.,* 875 F.2d 240 (9th Cir. 1989) (personal property sold at

18  UCC sale).  No sale of the same farm had occurred in the intervening years, and the June, 2004,

19  Bohlender South Farms' "offer" had withered too early to even be considered viable or relevant.

20  FED. R. EVID. 401.  In any event, offers to buy, which never close, are unreliable indicators of value,

21  and for that reason are generally inadmissible as <u>evidence</u> of a property's true value at a given time.

22  *See, e.g.,* 25 A.L.R. 4th 571 (2009); *see also Lee v. Lee*, 47 S.W. 3d 767, 785 (Tex. App. 2001)

23  ("unaccepted offers to purchase property are no evidence of market value"); *State v. McDonald,* 88

24  Ariz. 1, 352 P.2d 343 (1960) (condemnation case).

25         For these reasons, the court cannot accept Mr. Linscott's opinion as to the value of the

26  Ratliff capital contribution to CAP.  It simply accepts one party's side of the story, and fails to

27  appreciate the entire factual picture, and the effort to impartially evaluate the parties' intentions at

28  the relevant time is hopelessly biased.  It is, therefore, not credible.

The Campbells presented the report of Peter S. Davis (P-99). Mr. Davis is also well-credentialed, is a certified fraud examiner and CPA, and holds an MBA degree. Like Mr. Linscott, Mr. Davis has vast experience in legal disputes, and has testified as an expert numerous times. Mr. Davis delivered his written supplemental report on September 14, 2009, after his own independent review of relevant documents, including the report authored by Mr. Linscott (D-365).

In his initial report of August 17, 2009 (P-86), Mr. Davis presented his opening conclusions that the Ratliffs had withdrawn, to their benefit, and which they needed to pay back to CAP, the sum of $358,234.89 (Ex. 1 to P-86).

On this point, of "draws" to the Ratliffs or "unauthorized distributions," Mr. Linscott felt, from his review, that the Ratliffs owed CAP $348,394.89 (D-365 at 7).

Neither expert felt that Jeff Ratliff was entitled to a commission of any sort, much less one in the amount of $215,958.30 claimed by Mr. Ratliff in his communication of November 10, 2006 (P-59). Such a commission, if any, was not deserved, was never agreed to, and the parties never discussed it. This commission claim of the Ratliffs will therefore be disallowed, as never having been contractually agreed to, as the CAP Operating Agreement requires.

## P.  Reimbursement for Ratliffs' and RF's Preparation Expenses

The last piece of the legal puzzle involves the Ratliff and RF claims for reimbursement for farming preparation expenses. The Ratliffs claim that CAP had agreed to reimburse them for all or some of those expenses, as a prerequisite for closing the sale contract with N.K. (P-59, P-56; D-356). Todd Campbell acknowledged the legitimacy of some portion of that claim, but was requiring more specific information, insisting upon compliance with the CAP Operating Agreement.

When Jeff Ratliff submitted the claim, totaling $68,859.59, there was little detail provided. The largest expense was to Ratliff Ag LLC for $51,131.04. This company is owned by Jeff Ratliff's brother, Buddy Ratliff (P-59). Beyond these claims, a few emails and the internal QuickBooks accounts of RF, there were no backup invoices presented, nor more concrete support for any "agreement" that CAP agreed to fund $68,859.59.

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document        Page 24 of 40

The court, then, must rely on the only written agreement between the parties, the CAP Operating Agreement (D-311). That agreement provides:

> 5.4 *Actions Requiring Member Approval.*
>
> In addition to those actions for which this Agreement specifically requires the consent of the Members, the Company, and no Member shall take any of the following actions without first obtaining the approval of a Majority-In-Interest of the Members:
>
> * * *
>
> 5.4.10 Incur liability or indebtedness (other than in the ordinary course of business) greater than $1,000.00 in any single transaction or greater than $5,000.00 in the aggregate;
>
> 5.4.11 To enter into contracts with Members, Affiliates or Family which shall require the vote of a Majority-In-Interest of the other Members not parties to such transactions; . . . .

(D-311.) "Family" means siblings, which would include Buddy Ratliff (Sec. 2.1.10, D-311). "Majority-in-Interest" is defined as being one or more Members whose aggregate Participation Percentage exceeds fifty percent (50%) of the aggregate Participation Percentage of all Members (Sec, 2.1.14, D-311). In the Operating Agreement, which was never amended to state a different figure, the Participation Percentages of each couple was 50% (D-311, p. 29, Ex. "A"). Thus, under the agreement, Jeff Ratliff was not authorized to incur any single expense over $1,000, up to an aggregate amount of $5,000.

Turning to the request for reimbursement submitted by Jeff Ratliff, the only authorized expenditures were:

| | |
|---|---|
| General maintenance for tractors | $504.25 |
| Tractor rent | 923.31 |
| Miscellaneous supplies | 431.05 |
| | $1,858.61 |

(P-59.) All other requests were beyond Jeff Ratliff's legal authority to incur on behalf of CAP.

The court will allow an offset for that amount, against the $358,234.89 owed to CAP by the Ratliffs.

Case 4:09-ap-00275-JMM    Doc 77    Filed 12/07/09    Entered 12/08/09 09:23:36    Desc
Main Document    Page 25 of 40

# THE COURT'S CONCLUSIONS

From all of the disputed evidence, then, the court must decide what the capital accounts of each member couple was. The court's calculation is:

| Ex. | Event | Ratliffs | Campbells |
|---|---|---|---|
| (D-311) | February 23, 2005 (Formation of CAP) | $ 500 | 500 |
| (P- 31) | June 9, 2005 (Contribution to bring Western Bank interest current) | -- | 50,562 |
| (P-40, P-60) | June 20, 2005 (Contribution of equity in farm. $427,539 purchase price, less debt to Western Bank of $389,647) | 37,892 | -- |
| | Court's addition to capital based upon the evidence that the parties intended equal contributions[9] | 12,670 | -- |
| | | $51,062 | $51,062 |

According to the various tax returns, CAP considered the capital contributions of each member-couple to be equal in the returns filed for years 2004, 2005 and 2006. Thus, for purposes of calculating the respective contributions as of February 23, 2005 and June 20, 2005, the court will add $12,670 to the Ratliffs' side of the contribution ledger to even out the contributions to CAP as of June 20, 2005. This is to recognize the parties' intent that they were 50/50 "equal" partners. Thus, as of June 20, 2005, the parties had equal capital accounts. This was also true as of the date that CAP was formed.

What happened thereafter, insofar as attributing equality to the accounts, is agreed upon by both experts (with only a minor difference):

---

[9] In the adjustment of debtor-creditor relations, "The Supreme Court has long recognized that bankruptcy courts are courts of equity with the power to apply flexible equitable remedies in bankruptcy proceedings." *In re Trailer Source, Inc.*, 555 F.3d 231, 242 (6th Cir. 2009) (listing several U.S. Supreme Court cases citing same rule).

| Ex. | Expert | Unauthorized Disbursements Taken by Ratliffs from CAP |
|---|---|---|
| (P-86 at 6) | Peter S. Davis | $358,234.89 |
| (D-365 at 7) | Christopher G. Linscott | 348,394.89 |

The difference between the experts is $9,840. That difference is allegedly attributable to lack of documentation for a Bill's Pump invoice which, if valid, would reduce Mr. Davis' figure to match that of Mr. Linscott. However, none of the check registers produced as evidence contained any invoice or evidence of a check written to Bill's Pump for $9,840. (*See* P-42, P-44, P-61, P-93, P-92, P-94.) Nor did Jeff Ratliff's itemization of November 10, 2006 contain any evidence of such an invoice, nor any itemization therefor (D-356; P-59). A Bill's Pump invoice or payment was never substantiated by the Ratliffs.

Thus, the court finds and concludes that the Ratliffs drew $358,234.89 from CAP's accounts, to which they were not entitled. They must repay that sum to CAP.

However, as noted in Section P above, the Ratliffs are entitled to an offset against the unauthorized draws of $1,858.61.

## DEFENDANTS' COUNTERCLAIMS

On the record before the court, the court finds that Defendants failed to carry the necessary burden of proof in order to prove a cause of action against the Plaintiffs on any theory. Therefore, their claims shall be DISMISSED with prejudice.

27

# COURT'S ANSWERS TO PARTIES' QUESTIONS

## FROM JOINT PRETRIAL STATEMENT

Based on the foregoing findings and conclusions, the court will now proceed to address and answer the questions posted by the parties:

## Factual Questions

| | **A.** **Plaintiffs' Factual Questions** | **Court's Answers** |
|---|---|---|
| 1. | Did the Ratliffs convey a one-half interest in the Farm to Campbell and McRae effective July 2004? | No |
| 2. | What are the respective ownership interests of the Ratliffs and Campbell and McRae in CAP? | 50/50 |
| 3. | Are Defendants estopped from denying the Ratliffs were not 50/50 partners with Campbell and McRae because of the statements made in their sworn tax returns? | Yes |
| 4. | Were the Ratliffs authorized to pay personal expenses from CAP funds without Campbell's and McRae's permission? | No |
| 5. | If the Ratliffs improperly paid personal expenses from CAP funds without Campbell and McRae's permission, what amount do the Ratliffs owe CAP? | $358,234.89 (less offset of $1,858.61) |
| 6. | What amounts, if any, do the Ratliffs or Ratliff Farms owe CAP for payments or distributions in excess of amounts authorized under the CAP Operating Agreement? | $358,234.89 (less offset of $1,858.61) |
| 7. | Did Campbell and McRae agree that Jeff Ratliff should be compensated for work in connection with CAP or the Farm other than as stated in the CAP Operating Agreement? | No |

| | | |
|---|---|---|
| 8. | Did the Ratliffs breach the CAP Operating Agreement and their fiduciary duty to Campbell and McRae when the Ratliffs executed documents with Farm Credit Services in April 2007 purporting to assign 50.01% of CAP's interest in proceeds of the balance of a $2.4 million note from N.K. of Casa Grande, LLC as collateral for a loan that the Ratliffs obtained for personal reasons over Campbell's and McRae's objections? If so, how much was Campbell damaged? | The court does not understand the question. |
| 9. | What is the amount that Campbell and McRae are owed by CAP and/or the Ratliffs for improper distributions to or for the benefit of the Ratliffs? | CAP is owed $358,234.89 (less offset of $1,858.61). Once repaid, future distributions thereafter shall occur per the Operating Agreement. |
| 10. | Did Campbell and McRae suffer injury as a result of Jeff Ratliffs' fraudulent representations and misrepresentations, and in what amount? | Moot (dismissed) |
| 11. | Did the Ratliffs fail to provide records of the limited liability company to Campbell and McRae in violation of A.R.S. § 29-607? | No |
| 12. | Did the Ratliffs cause CAP to act without proper authority under A.R.S. § 29-652? | Yes |

| | | |
|---|---|---|
| **B.** | **Defendants' Factual Questions** | **Court's Answers** |
| 1. | Are the Ratliffs entitled to recoupment and/or setoff as a defense? | Yes, for a farming preparation expense of $1,858.61 only. |
| 2. | Are Plaintiffs estopped from asserting claims because of unclean hands due to their tax and other frauds? | No |
| 3. | Did the Plaintiffs breach the Operating Agreement? | No |
| 4. | Did Plaintiffs breach their fiduciary duty to Defendants? | No |

| | | |
|---|---|---|
| 5. | Did Plaintiffs commit actionable fraud? | No |
| 6. | Did Plaintiffs commit misconduct by engaging in a tax fraud designed to appropriate the Ratliff capital contributions, and to further deprive Mr. Ratliff of his time, expense and efforts in developing the farm? | No |
| 7. | Have the Plaintiffs been unjustly enriched? | No |
| 8. | Are Defendants entitled to rescission? | No |
| 9. | Did Plaintiffs convert property belonging to Defendants? | No |
| 10. | Did Campbell and McRae intentionally exercise complete control and dominion over proceeds stemming from Mr. Ratliff and Mrs. Ratliff's additional capital contribution, without Mr. Ratliff or Mrs. Ratliff's consent and for McRae and Campbell's exclusive benefit? | No |
| 11. | Did Plaintiffs breach the Implied Covenant of Good Faith and Fair Dealing? | No |
| 12. | Does the handwritten and backdated document referencing a transfer of property meet the requirements of the statute of frauds? | No |
| 13. | Can a spouse transfer the community's interest in real property without the consent and knowledge of his/her spouse? | No |
| 14. | Does A.R.S. §25-214 control a transfer of real property? | Yes |
| 15. | Are the Ratliffs entitled to be compensated for Jeff Ratliff's time and work in connection with the development of CAP? | No, except for $1,858.61 previously paid. |
| 16. | Are the Ratliffs entitled to the value of the Farm when it was contributed to CAP in June 2005? | Yes, but only to the extent of their equity in the amount of $37,892, plus the $12,670 adjustment made by the court. |

| | | |
|---|---|---|
| 17. | Have the Plaintiffs received more than their capital contribution to CAP? | Yes, from the N.K. payments, but what they have received to date is appropriate. |
| 18. | Are the Plaintiffs required to return money to the Ratliffs? | No |
| 19. | Based on the CAP, LLC, Operating Agreement, are the Ratliffs entitled to an initial capital account of $2,551,117.00? | No |
| 20. | Based on the CAP LLC Operating Agreement, are the Plaintiffs entitled to an initial capital account of $50,562.00? | Yes |
| 21. | Did the Ratliffs convey any interest in the Farm to Plaintiffs? If so, when and how? | Yes, to CAP on June 20, 2005. |
| 22. | Are the Ratliffs entitled to recover their fees and costs incurred in this action? | No |
| 23. | Have the Ratliffs committed any act that is non-dischargeable? | Yes |
| 24. | Does the CAP Operating Agreement control the actions of the members with regard to capital contributions and the return of those additional contributions? | Yes |
| 25. | Did the Plaintiffs defraud the Ratliffs by recharacterizing the transaction to benefit from long term capital gains treatment? | No |
| 26. | Can Jeff Ratliff convey Theresa Ratliff's interest in the Farm without her knowledge or consent? | No |
| 27. | Did Theresa Ratliff convey her interest in the Farm to Plaintiffs? | Yes, on June 20, 2005, to CAP. |
| 28. | Did Theresa Ratliff consent to an alleged transfer of the Farm pursuant to a back-dated document she did not know existed? | No |
| 29. | Did Jeff Ratliff commit fraud? | No (moot) |
| 30. | Did Theresa Ratliff commit fraud? | No (moot) |

31

**Legal Questions**

| | | |
|---|---|---|
| **A.** | **Plaintiffs' Legal Questions** | **Court's Answers** |

1. Was the conveyance of a half interest in the Farm to Campbell and McRae made and effective as of July 2004? — No

2. Did the Ratliffs breach their contracts with Campbell and McRae? — Yes, as fiduciaries relative to CAP distributions.

3. Did the Ratliffs breach their duty of good faith and fair dealing to Campbell and McRae? — Yes

4. Did the Ratliffs breach their fiduciary duty as members of CAP owed to Campbell and McRae? — Yes

5. Did the Ratliffs defraud Campbell and McRae? — No (moot)

6. Did the Ratliffs convert funds or other property to which Campbell and McRae were entitled? — Yes

7. Were the Ratliffs unjustly enriched at Campbell and McRae's expense? — Yes

8. Did the Ratliffs tortiously interfere with CAP's, Campbell's, and McRae's contractual rights? — No

9. Did the Ratliffs fail to provide records of the limited liability company to Campbell in violation of A.R.S. § 29-607? — No

10. To the extent that the Ratliffs caused CAP to act without proper authority under A.R.S. § 29-652, what is their liability for those debts or liabilities incurred? — $358,234.89, less an offset of $1,858.61.

11. May the Ratliffs and Ratliff Farms change their agreement made in the Superior Court hearing on October 25, 2007 that upon receiving any payments from the Farm Buyer, Security Title must first pay any escrow and brokerage fees, then split the remaining proceeds equally, issuing 50% to the Ratliffs and 50% to Campbell and McRae? — No

| | | |
|---|---|---|
| 12. | May Jeff Ratliff, who was not a licensed real estate salesperson or broker at the time, be paid a real estate commission? | No |
| 13. | Are the Ratliffs' counterclaims for fraud, breach of fiduciary duty by McRae, breach of implied duty of good faith and fair dealing, conversion, declaratory relief, breach of contract, unjust enrichment and rescission barred by the applicable statute of limitations? | Yes. Moreover, they did not carry their burden of proof on the merits of each count. |
| 14. | Is this an action arising out of contract within the meaning of ARIZ. REV. STAT. § 12-341.01(A), so that this Court may award CAP, Campbell and McRae reasonable attorneys' fees in an amount to be determined upon subsequent application to this Court? | Yes |

| | **B.** | **Defendants' Legal Questions** | **Court's Answers** |
|---|---|---|---|
| | 1. | Are the Ratliffs entitled to recoupment and/or setoff as a defense? | Yes, for $1,858.61. |
| | 2. | Are Plaintiffs estopped from asserting claims because of unclean hands due to their tax and other frauds? | No |
| | 3. | Did the Plaintiffs breach the Operating Agreement? | No |
| | 4. | Did Plaintiffs breach their fiduciary duty to Defendants? | No |
| | 5. | Did Plaintiffs commit actionable fraud? | No |
| | 6. | Did Plaintiffs commit misconduct by engaging in a tax fraud designed to appropriate the Ratliff capital contributions, and to further deprive Mr. Ratliff of his time, expense and efforts in developing the farm? | No |
| | 7. | Have the Plaintiffs been unjustly enriched? | No |
| | 8. | Are Defendants entitled to rescission? | No |
| | 9. | Did Plaintiffs convert property belonging to Defendants? | No |

| | | |
|---|---|---|
| 10. | Did Campbell and McRae intentionally exercise complete control and dominion over proceeds stemming from Mr. Ratliff and Mrs. Ratliff's additional capital contribution, without Mr. Ratliff or Mrs. Ratliff's consent and for McRae and Campbell's exclusive benefit? | No |
| 11. | Did Plaintiffs breach the Implied Covenant of Good Faith and Fair Dealing? | No |
| 12. | Does the handwritten and backdated document referencing a transfer of property meet the requirements of the statute of frauds? | No |
| 13. | Can a spouse transfer the community's interest in real property without the consent and knowledge of his/her spouse? | No |
| 14. | Does A.R.S. § 25-214 control a transfer of real property? | Yes |
| 15. | Are the Ratliffs entitled to be compensated for Jeff Ratliff's time and work in connection with the development of CAP? | No, except for $1,858.61 previously paid. |
| 16. | Are the Ratliffs entitled to the value of the Farm when it was contributed to CAP in June 2005? | Yes, but only to extent of the book value of the equity in the amount of $37,892, plus the $12,670 adjustment made by the court. |
| 17. | Have the Plaintiffs received more than their capital contribution to CAP? | Yes, from the N.K. payments, but legally in the form of distributions. |
| 18. | Are the Plaintiffs required to return money to the Ratliffs? | No |
| 19. | Based on the CAP, LLC, Operating Agreement, are the Ratliffs entitled to an initial capital account of $2,551,117.00? | No |
| 20. | Based on the CAP LLC Operating Agreement, are the Plaintiffs entitled to an initial capital account of $50,562.00? | Yes |

34

| | | |
|---|---|---|
| 21. | Did the Ratliffs convey any interest in the Farm to Plaintiffs? If so, when and how? | Yes. Their conveyance to CAP, recorded June 20, 2005. |
| 22. | Are the Ratliffs entitled to recover their fees and costs incurred in this action? | No |
| 23. | Have the Ratliffs committed any act that is non-dischargeable? | Yes. § 523(a)(4) and (6). |
| 24. | Does the CAP Operating Agreement control the actions of the members with regard to capital contributions and the return of those additional contributions? | Yes |
| 25. | Did the Plaintiffs defraud the Ratliffs by recharacterizing the transaction to benefit from long term capital gains treatment? | No |
| 26. | Can Jeff Ratliff convey Theresa Ratliff's interest in the Farm without her knowledge or consent? | No |
| 27. | Did Theresa Ratliff convey her interest in the Farm to Plaintiffs? | Yes, to CAP on June 20, 2005. |
| 28. | Did Theresa Ratliff consent to an alleged transfer of the Farm pursuant to a back-dated document she did not know existed? | No |
| 29. | Did Jeff Ratliff commit fraud? | No (moot) |
| 30. | Did Theresa Ratliff commit fraud? | No (moot) |

## **CONCLUSIONS OF LAW**

The Ratliffs breached the CAP Operating Agreement. In so doing, they simultaneously converted CAP's property by exercising dominion and control over N.K.'s annual instalment which was not theirs, at a time when Jeff Ratliff was the fiduciary for the LLC, in control of its accounts and funds. The conversion conclusion, by a fiduciary, implicates 11 U.S.C. §§ 523(a)(4) and (6) of the Bankruptcy Code, and renders the monetary judgment non-dischargeable.

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." A "defalcation" is the "misappropriation of trust funds or money held in any fiduciary capacity or the failure to properly account for such funds; it includes innocent defaults. *In re Lewis*, 97 F.3d 1182, 1186 (9th Cir. 1996) . While the meaning of "fiduciary" is a matter of federal law, state law is to be consulted to determine when a trust giving rise to the fiduciary relationship exists, as the debtor must have been a "trustee" before the wrongdoing and without reference to it. *Id.* at 1185; *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). In Arizona, shareholders that have the ability to control a corporation owe a fiduciary duty to the corporation and other shareholders, *Mims v. Valley Nat'l Bank*, 14 Ariz. App. 190, 192, 481 P.2d 876, 878 (1971) and *In re Sullivan*, 217 B.R. 670, 675-76 (Bankr. D. Mass. 1998) (applying Arizona law, citing cases and holding that "[i]n Arizona, it is well established that a director or officer of a corporation owes a fiduciary duty to the corporation" for purposes of § 523(a)(4)), and business partners owe a fiduciary duty to one another, *Lewis*, 97 F.3d at 1186.

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." This court looks to state law to determine whether an act falls within the tort of conversion, *In re Jercich*, 238 F.3d 1202 , 1206 & n.16 (9th Cir. 2001). To prove conversion in Arizona, a party must show "an act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another." *Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶11, 91 P.3d 362, 365 (App.2004) (quoting *Sears Consumer Fin. Corp. v. Thunderbird Prods.*, 166 Ariz. 333, 335, 802 P.2d 1032, 1034 (App.1990)). However, a technical conversion under state law is not necessarily a "willful and malicious injury." *In re Peklar*, 260 F.3d 1035, 1039 (9th Cir. 2001). Federal law requires more. In *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate and intentional act that leads to injury." *Id*.

Here, using CAP monies to pay their personal obligations, or the debts of RF, constituted a willful and malicious conversion under state law as well as a breach of fiduciary duty by the Ratliffs under the CAP Operating Agreement. The Ratliffs intended to injure, or knew there

was substantial certainty of injury to the Campbells by the conversion and thus the act constituted a "willful" injury. *In re Su*, 290 F.3d 1140 (9th Cir. 2002) (citing *Kawaauhau v.Geiger.* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). The conversion was also "malicious," because it was a wrongful act, done intentionally, which necessarily caused injury and was done without just cause or excuse. *Su,* 290 F.3d at 1146-47. The intended targets of the harm were the Campbells. The acts also constituted a defalcation by a fiduciary. *See, e.g., In re Baird*, 114 B.R. 198, 205 (9th Cir. BAP 1990) (Arizona corporate officer who misappropriated trust property was held personally liable in a § 523(a)(4) action); *In re Beeber*, 239 B.R. 13 (Bankr. E.D. N.Y. 1999) (conversion of a medical practice constituted a breach of fiduciary duty by defalcation).

## RULING AND REMEDIES

Judgment shall be entered in favor of CAP and the Campbells, as appropriate, against the Ratliffs and their marital community and Ratliff Farms, LLC for:

　　　　1.　　$358,234.89, together with interest at the rate of 10% per annum from October 26, 2006,[10] less an offset of $1,858.61.

---

[10] This is the date that the Ratliffs withdrew $358,902.89 from the CAP accounts and used it to repay their personal $350,000 line of credit to Well Fargo (P-61, P-93). CAP had no liability for that obligation. In Arizona, an award of prejudgment interest is allowed as a matter of right on a liquidated claim. "Damages are liquidated if 'the evidence of damages furnishe[es] data which, if believed, makes it possible to compute the amount of damages with exactness, without relying upon opinion or discretion.'" *In re Weinberg*, 410 B.R. 19, 37 (9th Cir. BAP 2009) (discussing prejudgment interest in § 523(a)(4) action) (citations omitted). October 26, 2006 is the date that is closest in time and amount, for purposes of liquidating the claim with certainty, a requirement for the awarding of interest. *See Gemstar Limited v. Ernst & Young*, 185 Ariz. 493, 508, 917 P.2d 222, 237 (1996). It is also clear that the date that the Ratliffs diverted the $358,902.89 properly liquidates the claim for purposes of allowing prejudgment interest. *Id.* ("As a general rule, the trial judge should calculate prejudgment interest from the date the claim becomes due.")

2.   The 10% interest rate is awarded pursuant to ARIZ. REV. STAT. § 44-1201(A), and is an annual non-compounding figure of $35,823.48.

3.   This monetary judgment shall be non-dischargeable against Harlan "Jeff" Ratliff, Theresa Ratliff and their marital community, as a violation of 11 U.S.C. §§ 523(a)(4) and (a)(6).

4.   For Plaintiffs' reasonable attorneys' fees pursuant to ARIZ. REV. STAT. §12.341.01, to be determined in further hearings, upon application.

5.   For Plaintiffs' taxable costs, pursuant to Arizona law, as applicable, and federal law, as applicable. A separate bill of costs shall be filed concurrently with the attorneys' fee application.

6.   The Defendants' counterclaims shall be dismissed, with prejudice, except for an offset for farming preparation expenses of $1,858.61.

7.   Control of the CAP checkbooks, bank balances and further control of the future instalment payments from N.K. shall be immediately transferred from Harlan "Jeff" Ratliff to a neutral party, who shall scrupulously account to all parties henceforth, and who shall be the responsible party to account for, receive payments and authorize disbursements from Security Title as to Account No. 048-35987-0 N K / COCHISE (*see* D-364). The parties may submit names or an agreed-upon name for this purpose.

8.   Appropriate offsets or recoupments, as applicable, from all existing (October, 2009) and future N.K. payments shall be made until the capital accounts are once more "trued up" and balanced. These offsets and recoupments are appropriate. *See* 11 U.S.C. § 553; *In re Buckenmaier*, 127 B.R. 233 (9th Cir. BAP 1991) (setoff); *In re Straightline Invs., Inc.*, 525 F.3d 870, 882 (9th Cir. 2008) (recoupment); *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir. 1984); *In re Madigan*, 270 B.R. 749 (9th Cir. BAP 2001). Only when the appropriate

Case 4:09-ap-00275-JMM   Doc 77   Filed 12/07/09   Entered 12/08/09 09:23:36   Desc
Main Document     Page 38 of 40

balances have been restored to CAP, pursuant to this judgment, shall monies otherwise due the Ratliffs be utilized in any plan of reorganization.

9. Judgment is granted in favor of the Plaintiffs as to Count I (Breach of Contract--Operating Agreement), Counts II and III (Breach of Implied Duty of Good Faith and Fair Dealing / Fiduciary Duty of Partner); Count V (Conversion); and such appropriate mandatory injunctions as are required in order to implement this judgment, and ensure its collection (Counts X and XI, Injunctive Relief),[11] and Count XII (Attorneys' Fees).

10. Count VI (Unjust Enrichment) and Count IX ( Unauthorized Assumption of Power--ARIZ. REV. STAT. § 29-652) are DISMISSED, with prejudice.

11. Count IV (Fraud) and VII (Tortious Interference with Contract) and Count VIII (Unlawful Withholding of Company Records --ARIZ. REV. STAT. § 29-607), were dismissed voluntarily by Plaintiffs.

12. Plaintiffs' monetary claims are declared to be non-dischargeable. 11 U.S.C. §§ 523(a)(4) and (6).

## JUDGMENT / ATTORNEYS' FEES / COSTS

Pursuant to FED. R. BANKR. P. 9021 (FED. R. CIV. P. 58), a separate judgment will be entered. Plaintiffs are directed to submit a form of judgment consistent with this Memorandum Decision.

The court shall conduct additional proceedings regarding its decision to award the Plaintiffs their attorneys' fees and taxable costs. In that regard, Plaintiffs shall file an application

---

[11] The parties should be prepared to address how this judgment impacts Security Title, a named defendant who did not actively defend.

39

therefor, properly supported, within 21 days of the entry on the docket of this Memorandum Decision. Once filed, Defendants may file an opposition thereto within 21 days thereafter. Plaintiffs shall reply within seven days. If the court feels that oral argument will be helpful, it will schedule it. Otherwise, it will rule on the pleadings.

As for Plaintiffs' costs, this court will award only such costs as are properly taxable. Since this matter involved disputes over Arizona state law contract and tort issues, as well as federal non-dischargeability issues, Arizona law, as well as federal law, will apply to cost issues. A request for costs shall be filed, separately itemizing each cost item sought, and citing appropriate legal authority for allowance. This cost bill shall be filed at the same time as the fee request, and the same time periods for responses shall apply.

DATED AND SIGNED ABOVE.

COPIES to be sent by the Bankruptcy Notification Center ("BNC") to the following:

Robert D. Mitchell
Mitchell & Associates PC
1850 N Central Ave
Phoenix, AZ 85004-0001
Attorneys for Plaintiffs

Rob Charles, Attorney for Plaintiffs

Sally M. Darcy, Attorney for Defendants

Office of the U.S. Trustee